KAREN P. HEWITT
United States Attorney
CHRISTOPHER A. OTT
Assistant U.S. Attorney
California State Bar No. 235659
Federal Office Building
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-6563

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 07CR3216-IEG |
| Plaintiff, | Date: January 14, 2008<br>Time: 9:00 a.m. |
| v. | |
| SERGIO SANTOS, | **UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS TO** |
| Defendant. | **1) DISMISS INDICTMENT DUE TO PURPORTED ERRORS IN THE PLEADING LANGUAGE;**<br>**2) DISMISS INDICTMENT DUE TO PURPORTED "PRESENTMENT ERROR;"**<br>**3) DISMISS INDICTMENT DUE TO PURPORTED IMPROPER GRAND JURY INSTRUCTIONS;**<br>**4) STRIKE SURPLUSAGE;**<br>**5) PRODUCE GRAND JURY PRESENTMENT INSTRUCTIONS;**<br>**6) SUPPRESS STATEMENTS;**<br>**7) COMPEL DISCOVERY; AND**<br>**8) PERMIT LEAVE TO FILE FURTHER MOTIONS**<br>**ALONG WITH UNITED STATES' MOTION FOR RECIPROCAL DISCOVERY AND FINGERPRINT EXEMPLARS**<br>**TOGETHER WITH STATEMENT OF FACTS, MEMORANDUM OF POINTS AND AUTHORITIES** |

COMES NOW, the plaintiff, the UNITED STATES OF AMERICA, by and through its counsel, KAREN P. HEWITT, United States Attorney, and CHRISTOPHER A. OTT, Assistant United States Attorney, and hereby files its Response and Opposition to Defendant's above-referenced motions.

This Response and Opposition is based upon the files and records of the case together with the attached statement of facts and memorandum of points and authorities.

## I

## STATEMENT OF THE CASE

On November 28, 2007, a federal grand jury in the Southern District of California returned a 1-count indictment against Defendant Sergio Santos ("Defendant"). The Indictment charges Defendant with one count of being a previously deported alien found in the United States, in violation of 8 U.S.C. § 1326.

On December 28, 2007, Defendant filed the above-captioned motions. The United States files the following response.

## II

## STATEMENT OF FACTS

On January 10, 1974, Defendant was born in Mexico. In or about May of 1990, Defendant entered the United States illegally. In or about May of 2001, Defendant was convicted in San Diego of one count of felony car theft and one count of evading a peace officer. He received 365 days of incarceration and 60 months of probation. On July 12, 2002, Defendant was convicted of one count of first degree burglary, in violation of California Penal Code 459; one count of stealing a car, in violation of California Vehicle Code 10851; and one count of misdemeanor obstructing justice, in violation of California Penal Code 148(a)(1). He received a total sentence of 2 years incarceration. On May 22, 2003, Defendant was ordered deported pursuant to an order by an immigration judge. Defendant was physically removed from the United States on June 2, 2003. He returned almost immediately. On December 15, 2003, Defendant was convicted of two counts of illegal entry, in violation of 8 U.S.C. § 1325. District Judge Irma E. Gonzalez sentenced this defendant to 30 months of incarceration. On August 5, 2005, Defendant again was physically removed from the United States.

Defendant re-entered illegally. On September 24, 2007, at approximately 6:30 pm, Defendant was found in the United States outside of a home in Chula Vista, California. He admitted his name when approached by Border Patrol Agents Soto and Liedecke. When asked about his citizenship, Defendant forced his way past and then ran from the Agents. Defendant was found hiding in a garage in which he

was trespassing. At that time, Defendant admitted his name and that he was a Untied States citizen.

At approximately 7:20 pm, Defendant waived his Miranda rights and gave a videotaped interview. In that interview, Defendant admitted to knowingly and intentionally crossing the international boundary line on April 4, 2007, admitted to being a Mexican citizen and also admitted to having no permission to enter or remain in the United States. Defendant also admitted that he was illegally working for a construction company.

## III

## RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT DUE TO PURPORTED FAILURE TO CHARGE ALL ELEMENTS

This motion is precluded by United States v. Salazar-Lopez, 506 F.3d 748 (9th Cir. 2007). As very recently re-stated by the Ninth Circuit in United States v. Calderon-Segura, No 05-50920 (9th Cir. January 9, 2008) (Attachment B):

> Under *Salazar-Lopez*, in order for a defendant to be eligible for an enhanced statutory maximum under § 1326(b), the indictment must allege, in addition to the facts of prior removal and subsequent reentry, either the date of the prior removal or that it occurred *after* a qualifying prior conviction.

Id. at * 334.

Since the indictment contained a special allegation that the deportation occurred after a date certain, all of Defendant's arguments as to the content of the indictment are legally baseless.

## IV

## RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT DUE TO PURPORTED VIOLATION OF THE RIGHT TO PRESENTMENT

Again, this motion is precluded by Salazar-Lopez. Defendant's argument is that the Grand Jury did not consider required elements. However, as shown by Salazar-Lopez, Defendant's putative elements are not required. Accordingly, the Grand Jury cannot be required to consider them and the motion should be dismissed.

//
//
//
//

# V

## RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO DISMISS INDICTMENT DUE TO THE ALLEGED MISINSTRUCTION OF THE GRAND JURY

Defendant has filed a lengthy attack upon this Court's own instructions to the Grand Jury. The United States believes that this motion should be summarily denied as baseless overreaching. Indeed, every court to face this boiler-plate motion has denied it as baseless. See Attachment A (lengthy order denying this precise motion). However, a point-by-point refutation follows.

A.   THE "WISDOM OF THE CRIMINAL LAWS" INSTRUCTIONS WERE CORRECT

The reply's contentions regarding the "wisdom of the criminal laws" instructions are nothing more than a cry for the courts to openly advocate, and thereby permit, jury nullification. The reply starts its argument with a snippet regarding John Peter Zenger, the poster boy for advocates of jury nullification. See United States v. Navarro-Vargas, 408 F.3d 1184, 1192 (9th Cir. 2005) (en banc) ("The most celebrated example in American history is that of John Peter Zenger"). That jury nullification is hidden as the agenda in the reply is evidenced by the use of terms like "deferential grand jury" and "constitutional prerogative." Courts acknowledge that jury nullification happens. Navarro-Vargas recounts "some grand jurors might in fact vote to return a no bill because they regard the law as unwise at best or even unconstitutional," 408 F.3d at 1204 (emphasis in original), and "there is nothing to prevent a grand jury from engaging in nullification or substantive constitutional review, not even the model grand jury instructions" Id., to wit, "there is no check on the ability of the grand jury to do so."[1]  408 F.3d at 1203.

However, while jury nullification may be a fact of life, it is not a right, and the courts cannot condone or otherwise encourage jurors to do so. Merced v. McGrath, 426 F.3d 1076 (9th Cir. 2005):

---

[1] While Navarro-Vargas relates to the grand jury setting, the courts realize the same thing applies to trials. See United States v. Schmitz, 525 F.2d 793, 794 (9th Cir. 1975) (Chambers C.J.) ("Of course, Bushel's case settled it that a judge is not permitted to force a jury to find a defendant guilty, but at the other end of the pole the jury has the inherent power to pardon one no matter how guilty. It exists, although we do not usually admit it.") See also, Horning v. District of Columbia, 254 U.S. 135, 138 (1920) (Holmes, J.) ("The judge cannot direct a verdict it is true, and the jury has the power to bring in a verdict in the teeth of both law and facts.").

> [W]hile jurors have the power to nullify a verdict, they have no right to do so. If jurors had a <u>right</u> to nullify, then a court would have a correlative <u>duty</u> to safeguard their ability to exercise this right. But courts manifestly do not have a duty to ensure a jury's free exercise of this power.

426 F.3d at 1079 (citations omitted, emphasis in original)). <u>See also</u> <u>United States v. Thomas</u>, 116 F.3d 606, 614 (2nd Cir. 1997) ("We categorically reject the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent."). The most far ranging discussion of the concept of "jury nullification," and why it is improper for a court to condone or permit it is found in <u>United States v. Dougherty</u>, 473 F.2d 1113 (D.C. Cir. 1972) wherein the District of Columbia Circuit remarked:

> This so-called right of jury nullification is put forward in the name of liberty and democracy, but its explicit avowal risks the ultimate logic of anarchy. This is the concern voiced by Judge Sobeloff in <u>United States v. Moylan</u>, 417 F.2d 1002, 1009 (4th Cir. 1969), <u>cert. denied</u>, 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970):
>
>> To encourage individuals to make their own determinations as to which laws they will obey and which they will permit themselves as a matter of conscience to disobey is to invite chaos. No legal system could long survive if it gave every individual the option of disregarding with impunity any law which by his personal standard was judged morally untenable. Toleration of such conduct would not be democratic, as appellants claim, but inevitably anarchic.

473 F.2d at 1133-34. To that end, it is not error to dismiss a juror for cause based on his belief that jury nullification is proper. <u>Merced</u>, 426 F.3d at 1079-80. Defendants are not entitled to "jury nullification" instructions. <u>United States v. Powell</u>, 955 F.2d 1206, 1213 (9th Cir. 1992). <u>See also</u> <u>Dougherty</u>, 473 F.2d at 1138 (" The fact that there is widespread existence of the jury's prerogative, and approval of its existence as a 'necessary counter to casehardened judges and arbitrary prosecutors,' does not establish as an imperative that the jury must be informed by the judge of that power." (footnote omitted)).

Therefore, when read in the context of all the grand jury instructions, Judge Burns' admonition to the grand jurors that "it's not for you to judge the wisdom of the criminal laws enacted by congress" properly covers the bases. The follow-on statement that "your option is not to say 'Well I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient'" [Partial Transcript pp.

8-9], blends in the same concept.[2]

### B. THE INSTRUCTIONS RELATING TO PROBABLE CAUSE WERE CORRECT

Defendant admits that "[i]t is true that on several occasions, Judge Burns used the word 'should' instead of 'shall' with respect to whether an indictment was required if probable cause existed." He then goes on to argue that Judge Burns' use of the word "should" was not what is condoned by Navarro-Vargas, because by other things he contends Judge Burns trumped himself during instructions by performing a mystical transformation whereby "'should' means 'shall' . . . and the juror has no prerogative to do anything other than indict if there is probable cause." This exercise leads Defendant to the astonishing conclusion that it is an "undeniable fact that Judge Burns explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause."

The January 10, 2007 transcript simply does not support this argument. See Partial Transcript pp. 3-4, 23 attached to our original Response as Appendix 1. The grand jurors were told by Judge Burns they had the discretion not to return an indictment per the holding in Navarro-Vargas.

Finally, in his papers Defendant has not addressed the proposition that even if there was an error, he has not demonstrated he was actually prejudiced thereby, a burden he has to bear. "Absent

---

[2] Additionally, this follow-on statement has nothing to do with "explicitly forbid[ing] the grand jury from even considering whether, under the circumstances of a particular case and its facts, an indictment should be returned or not regardless of whether there is probable cause" as maintained by Defendant.

In particular, Defendant asserts that Judge Burns' comments somehow absolutely forbid grand jurors from declining to return an indictment for which there is probable cause. Seen in context, Judge Burns' comments do not do so.

First, Judge Burns' comments make clear that the grand jurors could not refuse to return an indictment for which they found probable cause where the reason for their refusal was disagreement with Congress' passing the underlying law. By implication, this does not necessarily forbid declining to return an indictment for other reasons.

Second, Judge Burns instructed the jury that if they found probable cause, they "should" return an indictment. As even Defendant must acknowledge however, this court has approved use of this language, and in the law "should" is not construed imperatively but permissively. In addition, Defendant's attempts to put a linguistic straightjacket around Judge Burns' various uses of the word "should" should – no, must – be rejected. According to Defendant, Judge Burns uses of the word "should" can only be interpreted in the supposedly imperative and mandatory way that Defendant seeks to impose, and that he contends is impermissible. But there is no reason that lay jurors adhere to the rules of interpreting the word "should" in the way Defendant supposes.

1  such prejudice--that is, absent 'grave' doubt that the decision to indict was free from the substantial

2  influence of [the misconduct]'--a dismissal is not warranted." <u>United States v. Isgro</u>, 974 F.2d 1091,

3  1094 (9tht Cir. 1992).

       C.    THE DISMISSAL OF TWO GRAND JURORS WAS PROPER
            AND   HAD NO DELETERIOUS EFFECT ON THE GRAND
            JURORS WHO WERE IMPANELED

6        Defendant points to the dismissal of two prospective grand jurors by Judge Burns, and

7  contends the dismissals require that the Indictment be dismissed because:

8      ●    Those prospective grand jurors were sanctioned for expressing positions which

9  indicated they "would have been exercising their constitutional prerogative to act as the conscience

10 of the community . . . [by disagreeing] about the potential application of the law to particular cases."

11     ●    The dismissals had the effect of bullying the remaining prospective grand jurors to

12 "indict in every case where there is probable cause or . . . be excused as being unfit for this service."

13       Defendant contends these actions "created a constitutionally neutered grand jury" incapable

14 of "exercis[ing] its traditional power and prerogatives."  The record simply does not bear out these

15 claims.

16       First, concerning the dismissals themselves, the two prospective grand jurors in question

17 were interviewed by Judge Burns as found in the portions of the Supplemental Transcript attached to

18 our first response as Appendix 2.  The retired Clinical Social Worker [Supplemental Transcript, p.

19 15], stated:

20     I have some fairly strong feeling regarding drug cases.  <u>I do not believe that any
    drugs should be considered illegal</u>, and I think we're spending a lot of time and
21     energy persecuting and prosecuting cases where resources should be directed in other
    areas.

22

23     I also have strong feelings about immigration cases.  Again, I think we're
    spending a lot of time persecuting people that we should not be.

24 [Supplemental Transcript, p. 16 (emphasis added).]  After advising this prospective grand juror that

25 drug and immigration cases "are really the kind of the staple of the work we do here in the Southern

26 District of California," Judge Burns asked whether in spite of the strong feelings expressed, the

27 prospective grand juror "you can fairly evaluate those cases?" giving both the defendant and the

28 United States a "fair judgment."  [Supplemental Transcript, p. 16-17.]  Following-up Judge Burns

1  requested the prospective grand juror to consider whether he/she could go forward with an
2  indictment in spite of disagreeing with the laws. [Supplemental Transcript, p. 17.] The prospective
3  grand juror indicated he/she could not do that. [Supplemental Transcript, p. 17.] The prospective
4  grand juror was excused when he/she replied in the affirmative to the further question "would it be
5  difficult for you to support a charge even if you thought the evidence warranted it?" [Supplemental
6  Transcript, p. 17.]

7  The prospective grand juror real estate agent announced his/her disagreement with the
8  federal, as opposed to the state, position regarding medical marijuana. [Supplemental Transcript, p.
9  24-25.] He/she further stated, "<u>I also feel that drugs should be legal</u>." [Supplemental Transcript, p.
10 25 (emphasis added).] In the context of being interviewed about "enforcing the laws that Congress
11 gives us," the prospective grand juror went so far as to say, "I think rapists and murders ought to go
12 to jail, not people using drugs." [Supplemental Transcript, p. 26.] When it became apparent that the
13 prospective grand juror's views put him/her in a position where he/she was not "comfortable with"
14 returning an indictment charging violation of the drug laws, the prospective grand juror was
15 excused. [Supplemental Transcript, p. 27-28.]

16 Defendant here contends it was wrong to excuse these prospective grand jurors because they
17 were representing "the conscience of the community." To the contrary, these prospective grand
18 jurors had no place on the grand jury, as grand jurors are duty bound to accept and apply the laws
19 passed by Congress as all the cases hold, and as Judge Burns properly instructed them.[3]

---

[3] Of interest, Defendant does not contest the excusing of the insurance company employee prospective grand juror on the ground that he represented a "conscience of the community." When interviewed by Judge Burns, he immediately stated, "I'd be on the flipside of some of the individuals who have conveyed their concerns previously. I have a strong bias for the U.S. Attorney, whatever cases they might bring." [Supplemental Transcript, p. 38.] He also stated, "I have a very strong presumption with respect to any defendant that would be brought in front of us." [Supplemental Transcript, p. 40.] After discussing the prospective grand juror's strong views further [Supplemental Transcript, pp. 40-44], the following occurred:

> The Court: . . . I'm equally concerned with someone who would say, "I'm going to automatically drop the trap door on anybody the U.S. Attorney asks." I wouldn't want you to do that. If you think there's a possibility you'll do that, then I'd be inclined to excuse you.
>
> Prospective Juror: I think that there's a possibility I would be inclined to do that.

1    Concerning whether Judge Burns' used the excusing of the prospective grand jurors as a
2 method of coercing the impaneled grand jurors to return indictments "in every case where there is
3 probable cause or . . . be excused as being unfit for this service" , the Partial Transcript reveals that
4 did not happen.  Judge Burns said when instructing the impaneled grand jurors:

> You understood from the questions and answers that a couple of people were
> excused, I think three in this case, because they could not adhere to the principle that
> I'm about to tell you.
>
>    But it is not for you to judge the wisdom of the criminal laws enacted by
> congress; that is whether or not there should be a federal law or should not be a
> federal law designating certain activity as criminal is not up to you.

[Partial Transcript, p. 8.]  This passage simply does not evoke the "you must indict no matter what"
scenario proposed by Defendant.  Judge Burns was simply reminding the impaneled grand jurors of
their obligation not to judge the wisdom of the criminal laws, which all the cases allow him to do.

### D.  THE GRAND JURORS BEING TOLD ABOUT DUTIES IMPOSED BY THE UNITED STATES ATTORNEY'S MANUAL DID NOT INFECT THE GRAND JURY

Defendant contends Judge Burns' various statements regarding the duties of the U.S.
Attorneys "devastate any notion of the grand jury's protective powers." As we argued in our initial
Response, the remarks, based on Judge Burns' tenure as an Assistant U.S. Attorney, were
superfluous, and of no constitutional import.[4]  Navarro-Vargas, 408 F.3d at 1207 ("unnecessary
language [which] does not violate the Constitution.").

Defendant's reliance on United States v. Sells Engineering, 463 U.S. 418 (1983) is
misplaced.  Although the statement in Sells quoted by Defendant could be construed as a declaration
that the federal grand jury is a freelance investigative body, that is not the import or holding of

---

   The Court:   I"m going to excuse you, then.

 [Supplemental Transcript, p. 44.] If leaving prospective grand jurors on the panel were to be judged on a "conscience of the community" standard, as the instant Defendant suggests, this third prospective grand juror should also have remained on the panel.  Ironically, Defendant does not take up his cause.

   [4]   Attached hereto as our Appendix 3 to these proceedings is a transcript of Judge Burns ruling on one of the instant motions wherein he discusses his familiarity with the United States Attorney's Manual provisions.

1  Sells.[5] The question in Sells was whether attorney members of the civil division of the Department

2  of Justice had free access to grand jury materials comparable to the free access enjoyed by attorney

3  members of the criminal division of the Department of Justice. Further, even if the holding in Sells

4  were as Defendant proposes, the words of Judge Burns do not "foreclose avenues of investigation by

5  suggesting that the 'candid,' 'honest,' 'duty-bound' prosecutor would have presented such evidence

6  if an investigation could have turned it up." Judge Burns did not hamstring the new grand jury's

7  ability to conduct its business.

8      Defendant contends that Judge Burns effectively instructed the grand jurors that, if the U.S.

9  Attorney did not present any countervailing evidence, the grand jury must conclude that no such

10 evidence exists. That is not what Judge Burns said, nor is it implied by his comments.

11     Judge Burns told the grand jurors "in most instances" the U.S. Attorneys were duty bound to

12 present contrary evidence "if they're aware of that evidence." [Partial Transcript p. 20.] Thus, by

13 this comment's own terms, if the U.S. Attorney did not present countervailing evidence, there are at

14 least two explanations for this, aside from the "no such evidence exists" explanation Defendant

15 assumes. First, the absence of countervailing evidence could be explained by the fact that this was

16 not one of the majority instances ("most instances") but one of the minority instances where the U.S.

17 Attorneys were not duty bound to present contradictory evidence. Or, the absence could be

18 explained by the simple fact that the U.S. Attorney was not "aware of that evidence." Both of these

19 are gaping exceptions to the fallacious logic Defendant attempts to impose on the grand jury's

---

[5] The relationship between the grand jury and the U.S. Attorney is set forth in Sells: The purpose of the grand jury requires that it remain free, within constitutional and statutory limits, to operate "independently of either prosecuting attorney or judge." Nevertheless, a modern grand jury would be much less effective without the assistance of the prosecutor's office and the investigative resources it commands. The prosecutor ordinarily brings matters to the attention of the grand jury and gathers the evidence required for the jury's consideration. Although the grand jury may itself decide to investigate a matter or to seek certain evidence, it depends largely on the prosecutor's office to secure the evidence or witnesses it requires. The prosecutor also advises the lay jury on the applicable law. The prosecutor in turn needs to know what transpires before the grand jury in order to perform his own duty properly. If he considers that the law and the admissible evidence will not support a conviction, he can be expected to advise the grand jury not to indict. He must also examine indictments, and the basis for their issuance, to determine whether it is in the interests of justice to proceed with prosecution.

463 U.S. at 430. What Sells does not mention, but what is patently obvious, is that assuming the grand jury exercises its independent function and returns an indictment, it has no power to prosecute the case in district court -- that is done by the U.S. Attorney.

1  reasoning. [See Defendant's original Statement of Facts and Memorandum of Points and
2  Authorities in Support of Defendant's Motions.]

3  Even if Judge Burns' statements misled the grand jury, Defendant cannot demonstrate any
4  harm came to him either generally or specifically. Generally, United States v. Williams, 504 U.S.
5  36, 51-53 (1992) tells us defendants are not entitled to have exculpatory evidence presented to the
6  grand jury. Therefore, the fact the grand jury may wrongly assume there is no exculpatory in
7  existence if the prosecutor does not present any is irrelevant. Grand jurors do not make guilty/not
8  guilty decisions, they only decide whether there should be a prosecution where those decisions will
9  be made by persons other than themselves. Specifically, Defendant has not demonstrated that in his
10 case there is devastating exculpatory evidence that, if known by the U.S. Attorney and presented by
11 the U.S. Attorney to the grand jury, would have persuaded the grand jury to not return an indictment
12 against him.

## VI

## THE UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO "STRIKE SURPLUSAGE."

16 Defendant perplexingly argues that the allegation of the dates of deportation in the indictment
17 are both absolutely required to vindicate his rights, see Def.'s Motion at 2-5, and also constitutes
18 surplusage, see id. at 6. The law clearly permits the United States to charge violations of Section 1326(b)
19 by alleging date after which deportation occurred. That allegation appears in the indictment and should
20 not be struck for any reason.

## VII

## RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO COMPEL PRODUCTION OF THE GRAND JURY PRESENTMENT INSTRUCTIONS

24 Defendant has failed to articulate a coherent reading of the rules of law that counsels toward
25 production of these transcripts and overrides the secrecy provisions of Rule 6. Accordingly, the motions
26 should denied.

27 //
28 //

# VIII

# RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS HIS STATEMENTS

Defendant seeks to suppress all field admissions and post-Miranda statements. The request is not accompanied by a declaration. Consistent with Circuit law, District rules and this Court's own practice, the motion should be denied as improperly framed for review.

# IX

# THE UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTION TO COMPEL DISCOVERY ALONG WITH MEMORANDUM OF POINTS AND AUTHORITIES.

The United States has and will continue to fully comply with its discovery obligations under Brady v. Maryland, 373 U.S. 83 (1963), the Jencks Act (19 U.S.C. § 3500), and Rule 16 of the Federal Rules of Criminal Procedure. The United States has already produced 52 pages of discovery to defense counsel including investigative reports and tapes of Defendant's statements. These include all of Defendant's prior conviction documents and the documents supporting his only two deportations. Nevertheless, Defendant makes a series of discovery requests. The following is the United States' response to Defendant's various discovery requests.

1.   Statements of Defendant

The United States has already produced reports and tapes disclosing the substance of Defendant's oral and written statements. The United States will continue to produce discovery related to Defendant's statements made in response to questions by agents. Relevant oral statements of Defendant are included in the reports already provided.

2.   Arrest Reports, Notes and Dispatch Tapes

The United States has provided the Defendant with all arrest reports. To the United States' knowledge, no dispatch tapes exist.

3.   Brady Material

Again, the United States is well aware of and will continue to perform its duty under Brady and United States v. Agurs, 427 U.S. 97 (1976) to disclose exculpatory evidence within its possession that

//

is material to the issue of guilt or punishment. Defendant, however, is not entitled to all evidence known or believed to exist which is, or may be, favorable to the accused, or which pertains to the credibility of the United States' case. As stated in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980), it must be noted that:

> [T]he prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality. [Citation omitted.]

Id. at 774-775.

Although the United States will provide conviction records, if any, which could be used to impeach a witness, the United States is under no obligation to turn over the criminal records of all witnesses. United States v. Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976). When disclosing such information, disclosure need only extend to witnesses the United States intends to call in its case-in-chief. United States v. Gering, 716 F.2d 615, 621 (9th Cir. 1983); United States v. Angelini, 607 F.2d 1305, 1309 (9th Cir. 1979).

Finally, the United States will continue to comply with its obligations pursuant to United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991).

4.  Sentencing Information

Defendant claims that the United States must disclose any information affecting Defendant's sentencing guidelines because such information is discoverable under Brady. The United States respectfully contends that it has no such disclosure obligation under Brady.

The United States is not obligated under Brady to furnish a defendant with information which he already knows. Taylor, 802 F.2d at 1118 n. 5. Brady is a rule of disclosure, and therefore, there can be no violation of Brady if the evidence is already known to the defendant. In such case, the United States has not suppressed the evidence and consequently has no Brady obligation. See United States v. Gaggi, 811 F.2d 47, 59 (2d Cir. 1987).

But even assuming Defendant does not already possess the information about factors which might affect his guideline range, the United States would not be required to provide information bearing on Defendant's mitigation of punishment until after Defendant's conviction or plea of guilty and prior to his sentencing date. See United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir. 1988) ("No

//

1  [Brady] violation occurs if the evidence is disclosed to the defendant at a time when the disclosure
2  remains in value."). Accordingly, Defendant's demand for this information is premature.
3       5.    Defendant's Prior Record and Rule 404(b)
4       The United States has already provided Defendant with a copy of his criminal record in
5  accordance with Federal Rule of Criminal Procedure 16(a)(1)(B).
6       6.    Proposed 404(b) Evidence
7       Defendant should be on notice that his April 2007 crossing will not be used. Since the
8  circumstances of an entry have been ruled relevant to a found-in 1326 offense, this evidence is not Rule
9  404(b). Defendant should also be on notice that his prior two entries, the subject a prior judgment and
10 conviction of this very Court, shall be subject to entry into trial as Rule 404(b) evidence. In addition,
11 Defendant's statements about his employment will be introduced to show the voluntariness of his entry,
12 which is also now an element of this crime.
13      7.    Evidence Seized
14      Copies of all seized evidence have been produced in discovery. (This request is somewhat
15 perplexing ina Section 1326 prosecution).
16      8.    Preservation of Evidence
17      There is very little physical evidence in this 1326 case. To the extent that any has been
18 encountered (only the driver's license comes to mind) it will be preserved.
19      9.    Henthorn
20      The government is endeavoring to comply fully with its Henthorn obligations.
21      10.   Tangible Objects
22      Again, the United States is well aware of and will fully perform its duty under Brady and
23 Agurs to disclose exculpatory evidence within its possession that is material to the issue of guilt or
24 punishment. Defendant, however, is not entitled to all documents known or believed to exist, which
25 is, or may be, favorable to the accused, or which pertains to the credibility of the United States' case.
26      11.   Expert Witnesses
27      Defendant should be on notice that the United States will introduce the expert testimony of a
28 fingerprint expert. The CV of that expert will be provided as soon as one is chosen.

//

12. Impeachment and Evidence of Bias

The United States will review its evidence for any such bias.

13. Impeachment and Evidence of Criminal Investigation

As stated previously, the United States will turn over evidence within its possession which could be used to properly impeach a witness who has been called to testify.

14. Evidence of Criminal Investigation of Government Witness

Defendants are not entitled to any evidence that a prospective witness is under criminal investigation by federal, state, or local authorities. The Government is under no obligation to turn over the criminal records or rap sheet of its potential witnesses. Taylor, 542 F.2d at 1026. The Government will, however, provide the conviction record, if any, which could be used to impeach witnesses the Government intends to call in its case-in-chief. When disclosing such information, disclosure need only extend to witnesses the United States intends to call in its case-in-chief. United States v. Gering, 716 F.2d 615, 621 (9th Cir. 1983); United States v. Angelini, 607 F.2d 1305, 1309 (9th Cir. 1979).

15. Bias or Motive to Lie

The United States is unaware of any evidence indicating that a prospective witness is biased or prejudiced against Defendant. The United States is also unaware of any evidence that prospective witnesses have a motive to falsify or distort testimony.

16. Evidence Affecting Perception

The United States is unaware of any evidence indicating that a prospective witness has a perception, recollection, communication, or truth telling problem.

17. Witnesses Addresses

The United States would be happy to work with defense counsel to arrange interviews of all prospective governmental witnesses. The United States will not, however, disclose the home addresses of law enforcement personnel to a multiple felon.

18. Witnesses Favorable to Defendant

The United States is unaware of any witnesses favorable to the Defendant. If any appear, the United States will comply with its ongoing discovery obligations.

//
//

1    19.    Statements Favorable to Defendant

2    There are none. If any appear, they will be disclosed.

3    20.    Jencks Act Material

4    As stated previously, the United States will comply with its obligations pursuant to Brady,

5 Henthorn, and the Jencks Act.

6    21.    Giglio Information

7    As stated previously, the United States will comply with its obligations pursuant to Brady,

8 the Jencks Act, Henthorn, and Giglio v. United States, 405 U.S. 150 (1972).

9    22.    Discovery Related to Informants or Cooperating Witnesses

10    The United States is not aware of any informants or cooperating witnesses in this case.

11    23.    Personnel Records of Testifying Witnesses

12    Defendant has no right to discovery of these private personnel files. Screening will be done

13 pursuant to the United States' Henthorn obligations but no disclosure of the actual files will be

14 made.

15    24.    Scientific Tests and Expert Witnesses

16    The United States will provide the results of the fingerprint examinations as soon as they are

17 available.

18    25.    Residual Request

19    As it is overbroad, the United States will not comply with this request.

20                                                **X**

21    **RESPONSE AND OPPOSITION TO DEFENDANT'S PERMIT LEAVE TO FILE**
22                                    **FURTHER MOTIONS**

23    Defendant has filed more than two dozen motions, The motion for leave to file more should be

24 denied.

25 //

26 //

27 //

28 //
    //

## XI

## UNITED STATES' MOTION FOR RECIPROCAL DISCOVERY

1. <u>Rule 16(b)</u>

Defendant has invoked Federal Rule of Criminal Procedure 16(a) in his motion for discovery and the United States has already voluntarily complied with the requirements of Federal Rule of Criminal Procedure 16(a). Therefore, Rule 16(b) should presently be determined to be operable as to Defendant.

The United States, pursuant to Rule 16(b), hereby requests that Defendant permit it to inspect, copy, and photograph any and all books, papers, documents, photographs, tangible objects, or make copies of portions thereof, which are within the possession, custody, or control of Defendant and which he intends to introduce as evidence in his case-in-chief at trial. The United States further requests that it be permitted to inspect and copy or photograph any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, which are in the possession or control of Defendant, which he intends to introduce as evidence-in-chief at the trial or which were prepared by a witness whom Defendant intends to call as a witness. The United States also requests that the Court make such orders as it deems necessary under Rule 16(d)(l) and (2) to insure that the United States receives the discovery to which it is entitled.

2. <u>Rule 26.2</u>

Federal Rule of Criminal Procedure 26.2 requires the production of prior statements of all witnesses, except any statement of Defendant. The rule provides for the reciprocal production of Jencks statements. The time frame established by the rule requires the statement to be provided after the witness has testified, as in the Jencks Act. Therefore, the United States hereby requests that Defendant be ordered to supply all prior statements of defense witnesses by a reasonable date before trial to be set by the Court. This order should include any form these statements are memorialized in, including, but not limited to, tape recordings, handwritten or typed notes, and/or reports.

//
//
//
//

## XII

## UNITED STATES' MOTION FOR FINGERPRINT EXEMPLARS

As part of its case, the United States must prove that Defendant was previously deported from the United States. To prove this element, the United States anticipates calling a certified fingerprint examiner to testify that Defendant is the individual whose fingerprint appears on the warrants of deportation and other deportation documents. Defendant has indicated that he will stipulate that the prints taken at the time of his arrest were his. However, if he backs out, the United States will need an order to get this important aspect of the case done.

## XIII

## CONCLUSION

For the above stated reasons, the United States respectfully requests that Defendant's motions be denied.

DATED: January 8, 2008

                                        Respectfully submitted,

                                        KAREN P. HEWITT
                                        United States Attorney

                                        /s Christopher A. Ott
                                        CHRISTOPHER A. OTT
                                        Assistant U.S. Attorney

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Criminal Case No. 07CR3216-IEG** |
| **Plaintiff,** | ) | |
| | ) | **CERTIFICATE OF SERVICE** |
| **v.** | ) | |
| | ) | |
| **SERGIO SANTOS,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

IT IS HEREBY CERTIFIED that:

I Christopher A. Ott, , am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of THE UNITED STATES' RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

John Ellis, Esq.

A hard copy is being sent to chambers.
I declare under penalty of perjury that the foregoing is true and correct.
Executed on January 8, 2008

                                                /s Christopher A. Ott
                                                CHRISTOPHER A. OTT